UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>HOMERO JOSHUA GARZA,<br>GAW MINERS, LLC, and<br>ZENMINER, LLC (d/b/a ZEN CLOUD),<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No. 3:15-CV-1760-JAM<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**SECURITIES AND EXCHANGE COMMISSION'S MEMORADUM IN
SUPPORT OF ITS MOTION FOR DEFAULT JUDGMENT
<u>AGAINST GAW MINERS, LLC AND ZENMINER, LLC</u>**

Kathleen B. Shields
Gretchen Lundgren
Michele Perillo
Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8904

John B. Hughes
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 23rd Floor
New Haven, CT  06510
(203) 821-3700

February 12, 2016

# Table of Contents

INTRODUCTION ................................................................................................1

PROCEDURAL BACKGROUND .....................................................................1

FACTUAL BACKGROUND...............................................................................2

DEFAULT JUDGMENT STANDARD................................................................3

ARGUMENT........................................................................................................4

I.  THE COMPLAINT ESTABLISHES GAW MINERS' AND ZENMINER'S LIABILITY FOR SECURITIES FRAUD. ..........................................................................4

    A. Hashlets are "Securities" under the Securities Act and the Exchange Act..................5

        1. GAW Miners' and ZenMiners' Sales of Hashlets Required an Investment of Money...............................................................................................6

        2.  Hashlets Involve a Common Enterprise. .........................................................7

        3.  Investors Expected Profits from the Efforts of GAW Miners and ZenMiner... 9

    B. GAW Miners "Made" Misstatements Pursuant to Exchange Act Section 10(b), and Rule 10b-5(b)...............................................................................10

    C. GAW Miners and ZenMiner Obtained Money and Property Through Means of Direct Misstatements and By Means Of the Misstatements of Others in Violation of Section 17(a)(2)......................................................................................11

    D. The Statements Made by GAW Miners and Used by GAW Miners and ZenMiner Were Material..............................................................................12

    E. GAW Miners and ZenMiner Employed Schemes and Engaged in Courses of Conduct that Violated Section 17(a)(1) & (3) and Section 10(b) and Rule 10b-5(a) and 5(c) Thereunder.............................................................................13

    F.  GAW Miners and ZenMiner Acted with Scienter.....................................................14

II.  THE COMPLAINT ESTABLISHES GAW MINERS' AND ZENMINER'S LIABILITY FOR PARTICIPATING IN AN UNREGISTERED DISTRIBUTION OF SECURITIES. ..........15

III.  THE COMMISSION IS ENTITLED TO INJUNCTIVE AND MONETARY RELIEF.......16

    A.  Permanent Injunction ...............................................................................16
    B.  Disgorgement and Prejudgment Interest.................................................18
    C.  Civil Money Penalty.................................................................................21

CONCLUSION ................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980)..................................................................................5

*Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir. 1981)...............................4, 5

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ...............................................................12

*Bermudez v. Reid*, 733 F.2d 18 (2d Cir. 1984) ................................................................4

*Cement and Concrete Workers Dist. Council Welfare Fund v. Metro Foundation Contractors, Inc.*, 699 F.3d 230 (2d Cir. 2012) ...................................................................................4

*Century Metal Recycling, Pvt., Ltd. v. Dacon Logistics, LLC*, No. 3:13-cv-93, 2014 WL 129409 (D. Conn. Jan. 13, 2014)...........................................................................................4

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ......................................................14

*Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974) .................................................................4

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011) ......................................19

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ........................................12

*Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027(2d Cir. 1974)................6

*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979) ................................................7

*Janus Capital Group v. First Derivative Traders*, 131 S.Ct. 2296 (2011).............10-11

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ...............................................7, 8

*Rolf v. Blyth, Eastman Dillon & Co..,* 570 F.2d 38 (2d Cir. 1978) .............................15

*SEC v. Amerindo Invest. Advisors, Inc..,* 2014  WL 2112032 (S.D.N.Y. May 6, 2014).........17-18

*SEC v. Anticevic*, No. 05-cv-6991, 2009 WL 4250508 (S.D.N.Y. Nov. 30, 2009) .......................4

*SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982).................................6, 9

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015) .....................11

*SEC v. Cavanaugh*, 155 F.3d 129 (2d Cir. 1998) ........................................................17

*SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2001) ................................................23

*SEC v. Cobalt Multifamily Investors I, LLC*, No. 06-cv-2360, 2011 WL 4899909 (S.D.N.Y. June 14, 2011)................................................................................................................17

*SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014) ...........15

*SEC v. Cole*, 2014 WL 4723306 (S.D.N.Y. Sept. 22, 2014);...............................4, 18

*SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d  467 (S.D.N.Y 2009)....................23

*SEC v. Commonwealth Chem. Sec. Inc.,* 574 F.2d 90 (2d Cir. 1978) ..........................17

*SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014) ..........................................................18

*SEC v. DiBella*, No. 3:04-cv-1342, 2008 WL 6965807 (D. Conn. Mar. 13, 2008) .....................23

*SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009)..............................................................14

*SEC v. E-Smart Tech., Inc.*, No. 11-895, 2015 WL 5952237 (D.D.C. Oct. 13, 2015).................23

*SEC v. Edwards*, 540 U.S. 389 (2004) .........................................................................6, 9

*SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450 (2d Cir. 1996)................................5, 18, 19, 20, 21

*SEC v. Global Telecom Servs.*, 325 F.Supp. 2d 94 (D. Conn.  2004) ..................8, 15, 24

*SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002)......................24

*SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304 (D.C. Cir. 1992) .................................9

*SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1 (D.D.C. 1998) ..................................22, 23

*SEC v. Lybrand*, 281 F. Supp. 2d 726 (S.D.N.Y. 2003), *aff'd sub nom, SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) ...............................................................................................22, 23, 24

*SEC v Management Dyn., Inc.*, 515 F.2d 801 (2d Cir. 1975)..................................17, 18

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)............................................15, 18
*SEC v. Michel*, No. 06-c-3166, 2008 WL 516369 (N.D. Ill. Feb. 22, 2008)................................24
*SEC v. Monterosso*, 756 F.3d1326 (11th Cir. 2014) ....................................................................13
*SEC v. Moran*, 944 F. Supp. 286 (S.D.N.Y. 1996) ................................................................20, 22
*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999)........................................................5
*SEC v. Pardue*, 367 F. Supp. 2d 773 (E.D. Pa. 2005) ................................................................25
*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013) ............................................13
*SEC v. Prater*, 289 F. Supp. 2d 39 (D. Conn. 2003) ......................................................6, 13, 16, 17
*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)..........................................................................16
*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2014)......................................................................19, 22
*SEC v. Rosenthal*, 426 Fed. App'x. 1 (2d Cir. 2011) ...................................................................22
*SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) ..............................................................................7
*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ...............................................................................6, 9
*SEC v. Shavers*, No. 4:13-cv-416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) .......................6, 7
*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998)..16
*SEC v. Spence & Green Chem. Co.*, 612 F.2d 896 (5th Cir. 1980)..............................................16
*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012) ............................................................11, 12
*SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013)..................................................................16
*SEC v. Svoboda*, 409 F. Supp. 2d 331 (S.D.N.Y. 2006)..............................................................25
*SEC v. Tambone*, 550 F.3d 106 (1st Cir. 2008), *aff'd in rel. part*, 597 F.3d 436 (1st Cir. 2010)..11
*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)......................................................12
*SEC v. U.S. Enviromental, Inc.* 155 F.3d 107 (2d Cir. 1998).................................................14-15
*SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044 (2d Cir. 1976)..........................................17
*SEC v. W.J. Howey*, 328 U.S. 293 (1946) ..................................................................................6, 9
*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998).................................................................................20
*SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014) ......................................................................20
*Teague v. Bakker*, 35 F.3d 978 (4th Cir. 1994) .............................................................................6
*United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975).......................................................9
*United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014) ......................................................7
*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) .............................................................9-10
*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ....................................................7
*Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996).....................................................9

**Statutes**
Securities Act, §2, 15 U.S.C. § 77b............................................................................................5
Securities Act, §5, 15 U.S.C. § 77e ..............................................................................15, 16, 18
Securities Act, §17(a), 15 U.S.C. § 77q(a) ..............................................1, 5, 11, 12, 13, 14, 18
Securities Act, §20(d), 15 U.S.C. § 77t(d) ..........................................................16, 17, 21, 22
Exchange Act, §3, 15 U.S.C. § 78c ..............................................................................................5
Exchange Act, §10(b), 15 U.S.C. § 78j(b) ...............................................................................1, 5
Exchange Act, §21(d), 15 U.S.C. § 78u(d)..........................................................16, 17, 21, 22

ii

**Treatises**

10A Wright, Miller, & Kane, Federal Practice & Procedure § 2685 (3d ed. 1998).....................3-4

**Regulations**

17 C.F.R. §201.1005................................................................................................................22

17 C.F.R. §201.600(b).............................................................................................................21

Rule 10b-5, 17 C.F.R. §240.10b-5 ......................................................................5, 11, 13, 14, 18

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 55(b)(2), plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its motion for default judgment against defendants GAW Miners, LLC ("GAW Miners") and ZenMiner, LLC ("ZenMiner"). The Commission seeks a default judgment because GAW Miners and ZenMiner failed to answer or otherwise defend the Commission's Complaint against them.

GAW Miners and ZenMiner engaged in a fraudulent course of conduct by which they oversold investments in their purported virtual currency mining operations. Despite claiming to possess large and sophisticated virtual currency mining operations, defendants lacked the computing power that was supposed to be powering the vast majority of those operations and generating the profit in which investors were told they would share. In furtherance of its fraud, GAW Miners also made numerous misrepresentations to investors and potential investors about the nature and profitability of the investments it was selling. None of the investment contracts that defendants sold were registered with the Commission, as they were required to be.

Accordingly, the Commission respectfully requests that the court enter a default judgment against GAW Miners and ZenMiner that: 1) permanently enjoins them against violations of Sections 5 and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and 2) orders them to pay disgorgement plus prejudgment interest and appropriate civil money penalties.

## PROCEDURAL BACKGROUND

In December 2015, the Commission filed a civil injunctive action against GAW Miners,

ZenMiner, and Homero Joshua Garza ("Garza"), who controlled both GAW Miners and ZenMiner. The Complaint alleged that from about August through December 2014, all of the defendants participated in a fraudulent scheme to oversell investments in their purported virtual currency mining operations. *See* Complaint, ¶¶2-3. Defendant Garza signed a waiver of service of the summons, and moved to extend his time to respond to the Complaint, so his answer or responsive pleading is not yet due. *See* Dkt. No. 9, 14. GAW Miners and ZenMiner were served with the Complaint on December 4, 2015. *See* Dkt. Nos. 7, 8. Their responses to the Complaint were due on December 28, 2015, but they failed to answer or otherwise defend. *See* Dkt. No. 10-1. On January 6, 2016, the Commission moved for an entry of default pursuant to Federal Rule of Civil Procedure 55(a), which was entered on January 27, 2016. *See* Dkt. No. 13.

## FACTUAL BACKGROUND

The Complaint alleged that, beginning in August 2014, GAW Miners and ZenMiner began selling Hashlet investment contracts to investors. *See* Complaint, ¶¶27, 32-35, 38. Buying a Hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. *See id.*, ¶38. GAW Miners and ZenMiner sold far more Hashlets of computing power than they actually had in their data centers or used to engage in virtual currency mining. *See id.*, ¶¶48-49. There was no computer equipment to back up the vast majority of Hashlets that the two companies sold. *See id.* As a result, most of the purported "returns" that were paid to investors were not actually proceeds earned from virtual currency mining. *See id.*, ¶¶54, 66. Instead, most of those claimed returns were the slow payback, over time, of money investors collectively had paid to purchase Hashlets. *See id.*, ¶¶6, 67. In this

2

way, defendants' operations resembled a Ponzi scheme. *See id.*

As another aspect of its fraudulent conduct, GAW Miners, often through its CEO Garza, also made a number of false and misleading statements to investors and potential investors about its, and ZenMiner's, virtual currency mining operations. First, GAW Miners misleadingly claimed that Hashlets would be always profitable and never obsolete, when it had no reasonable basis to support those claims. *See id.*, ¶59. Second, GAW Miners misleadingly claimed that Hashlets were engaged in mining for virtual currency through pools available in ZenMiner's website interface, when it knew that few Hashlets were supported by actual mining activity. *See id.*, ¶¶64, 66. Third, GAW Miners misleadingly claimed that its proprietary mining pool, called ZenPool, which was available only through ZenMiner's website interface to investors who purchased more expensive types of Hashlets, was actually engaged in mining. To the contrary, it knew that ZenPool never engaged in mining. *See id.*, ¶¶69-71. Many of these statements were made on GAW Miners' website and GAW Miners'-controlled message boards, and by GAW Miners' CEO, founder, and controlling person, Garza. *See id.*, ¶¶14, 59, 66, 69. At the time GAW Miners and Garza made these false and misleading statements, they knew or should have known that the statements were false. *See id.*, ¶¶60, 66-68, 72-73.

GAW Miners and ZenMiner sold at least $19 million of Hashlets, to more than 10,000 investors. *See id.*, ¶51. Most Hashlet investors never recovered the full amount of their investments through the daily payouts of purported "returns," and few made a profit. *See id.*, ¶¶6, 67.

## DEFAULT JUDGMENT STANDARD

The entry of a default judgment is left to the "sound judicial discretion" of the court. 10A

3

Wright, Miller, & Kane, *Federal Practice & Procedure* §2685 (3d ed. 1998).  Where, as here, a "party fails to respond [to an action], … the court is ordinarily justified in entering a judgment against the defaulting party." *SEC v. Anticevic*, No. 05-cv-6991, 2009 WL 4250508 (S.D.N.Y. Nov. 30, 2009) (quoting *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984)).  In determining whether to enter a default judgment, the court should accept as true all of the factual allegations in the Complaint, except those relating to damages.  *See Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981); *SEC v. Cole*, No. 12-cv-8167, 2014 WL 4723306, at *2 (S.D.N.Y. Sept. 22, 2014).  The Commission is "also entitled to all reasonable inferences from the evidence offered." *Au Bon Pain,* 653 F.2d at 65; *Cole*, 2014 WL 4723306, at *2.  Though it must accept factual admissions, the court should determine whether the well-pled allegations legally establish defendants' liability.  *See Century Metal Recycling, Pvt., Ltd. v. Dacon Logistics, LLC*, No. 3:13-cv-93, 2014 WL 129409, *2 (D. Conn. Jan. 13, 2014).

The "quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974).  While the court may "conduct a hearing to determine damages, such a hearing is not mandatory," and the court may determine damages based on the submission of "detailed affidavits and documentary evidence." *Cement and Concrete Workers Dist. Council Welfare Fund v. Metro Foundation Contractors, Inc.*, 699 F.3d 230, 234 (2d Cir. 2012).

## ARGUMENT

## I.     THE COMPLAINT ESTABLISHES GAW MINERS' AND ZENMINER'S LIABILITY FOR SECURITIES FRAUD.

GAW Miner's and ZenMiner's course of conduct to oversell investments in its claimed virtual currency mining operations, as well as GAW Miners' issuance of numerous false

4

statements about material aspects of those mining operations, violated the anti-fraud provisions of the securities laws.  Section 17(a) of the Securities Act prohibits, in the offer or sale of securities:  (1) employing devices, schemes or artifices to defraud, (2) obtaining money or property by means of materially false or misleading statements, and (3) transactions, practices or courses of business that operate as a fraud or deceit.  15 U.S.C. §77q(a).  Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (a) employing any device, scheme or artifice to defraud; (b) making any untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in acts, practices or courses of business that operate or would operate as a fraud or deceit upon any person.  *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(a)-(c).  Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require a showing of scienter; violations of Sections 17(a)(2) and 17(a)(3) do not.  *See Aaron v. SEC*, 446 U.S. 680, 685-86 n.5, 695-97 (1980); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996).

**A. Hashlets are "Securities" under the Securities Act and the Exchange Act.**

The definition of "security" under both Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act includes an "investment contract."  15 U.S.C. §77b(1); 15 U.S.C. §78c(a)(10).  Under both statutes, an investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets

5

employed in the enterprise." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).  This standard is flexible and is "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

The test for an investment contract has three parts:  whether the scheme (i) involves an investment of money, (ii) in a common enterprise, and (iii) with profits to come solely from the efforts of others. *See id.* at 301.  This standard has been applied to find that the investment opportunities described in a wide variety of cases were securities. *See, e.g., Howey*, 328 U.S. at *298* (citrus groves and service contract); *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (sale of payphones with packaged leaseback and management agreement); *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 579-80 (2d Cir. 1982) (licenses for sale of certain dental devices); *SEC v. SG Ltd.*, 265 F.3d 42, 45 (1st Cir. 2001) (digital shares in virtual companies); *Teague v. Bakker*, 35 F.3d 978, 981 (4th Cir. 1994) (purchase of life partnership in evangelical community); *Glen–Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1035 (2d Cir. 1974) (purchase of Scotch whiskey with promise of company's expertise in the selection, storage, and resale of the product); *SEC v. Shavers*, No. 4:13-CV-416, 2013 WL 4028182, at *3 (E.D. Tex. Aug. 6, 2013) (pooling of bitcoins in bitcoin market arbitrage operation in return for an "interest rate"); *SEC v. Prater*, 289 F. Supp. 2d 39, 51 (D. Conn. 2003) (related schemes promising a stream of payments in exchange for an initial investment were selling investment contracts).

### 1. GAW Miners' and ZenMiners' Sales of Hashlets Required an Investment of Money

Many Hashlets were purchased with U.S. currency. *See* Complaint, ¶¶41, 47.  However, even those purchased with bitcoin still required "an investment of money." *See id.,* ¶41.  In another case examining the payment of virtual currency in an investment scheme, the Eastern

District of Texas determined that investments of bitcoin are investments of money. *Shavers,* 2013 WL 4028182, at *2; *see also United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) (bitcoins are "funds" in the context of the federal anti-money laundering statute); *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) (bitcoin is money under 18 U.S.C. §1960; case involved allegations that defendant operated an unlicensed money transmitting business). *Shavers* reasoned that bitcoin can be used as money, can easily be converted to conventional currencies, can be used to purchase goods, services, or living expenses, and is only limited by whether an entity accepts bitcoin as payment, and thus functions as money. *Id.* at *5. In any event, it is well-established that the "investment of money" element can be satisfied with consideration other than U.S. currency. *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560, n.12 (1979); *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (investor need only commit his assets in such a manner as to "subject himself to financial loss").

### 2.    Hashlets Involve a Common Enterprise.

Though courts nationwide are divided as to how to properly apply the common enterprise prong of the *Howey* test, the Second Circuit, and the majority of courts nationwide, have relied on the horizontal commonality test. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). This horizontal commonality test focuses on the horizontal relationship among investors, and requires an enterprise in which investors' contributions are pooled, and the fortunes of each investor depend on the success of the overall venture.

The way Hashlets were marketed to investors demonstrates how investors' fortunes were dependent on the overall success of GAW Miner's and ZenMiners' mining operations. First, investors were told that they were buying the rights to a share or slice of the vast amount of

7

computing power that GAW Miners possessed and dedicated to mining.  *See* Complaint, ¶38. (Hashlets were defined as "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware").  Hashlet investors were not buying their own computer, but rather were pooling their payments and relying on GAW Miners and ZenMiner to buy, maintain, connect, and operate the computers that would be used to generate a profit.  *See id.,* ¶39.  That profit, in turn, would be paid out to investors in proportion to the share of computer power they had subsidized through their investments.  *See id.*, ¶40.  Moreover, investors' fortunes were tied to the venture's overall success because investors had to direct their purported Hashlet's power to engage in mining in one of the few mining pools available through ZenMiner's website interface.  *See id.*  Hashlet investors pooled their computer power to generate returns from these pools, and the pools had a better chance of obtaining a return if more computing power was directed towards them.  *See id.*, ¶22.  The fact that GAW Miners lied to investors and failed to direct computing power towards the pools that investors chose does not change the fact that investors bought into GAW Miners' and ZenMiner's scheme believing that they were relying on GAW Miners' and ZenMiner to run a successful virtual currency mining operation that would generate profits in which they shared.  *See SEC v. Global Telecom Servs.*, 325 F. Supp. 2d 94, 113 (D. Conn. 2004) (investors' money pooled to operate company and manufacture and sell product; each investor to receive a royalty based on the sales of the company); *compare Revak*, 18 F.3d at 88-89 (no pooling of rents or expenses by condominium unit owners, rather, each unit owner could profit or sustain losses independent of other unit owners).

    Furthermore, horizontal commonality exists to the extent that GAW Miners and

ZenMiner operated as a Ponzi scheme. "[I]nvestments in a pyramid scheme [are] 'investment contracts' and thus securities within the meaning of the federal securities laws." *Webster v. Omnitrition Int'l., Inc.*, 79 F.3d 776, 784 (9th Cir. 1996). Ponzi schemes have consistently been held to involve securities. *See id.*; *SG Ltd.*, 265 F.3d at 51; *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307-08 (D.C. Cir. 1992). The fortunes of all Hashlet investors were tied together because their investment money was pooled and used to pay the supposed "profits" of all Hashlet owners, who could receive payments only so long as the entire scheme remained in operation. *See* Complaint, ¶¶43, 67, 68.

### 3. Investors Expected Profits from the Efforts of GAW Miners and ZenMiner.

The final prong of the *Howey* test asks whether investors expected their investment to generate a profit "solely" as a result of the efforts of the promoter or a third-party. Profits, as used in the *Howey* test, refers to the profits that investors seek on their investment; it is used "in the sense of income or return," including "dividends, other periodic payments, or the increased value of the investment." *Edwards*, 540 U.S. at 394; *see also SG Ltd.*, 265 F.3d at 54 (prospect of a sure-fire return based on SG's representations lured participants to buy shares in the privileged company). The Supreme Court restated the "solely" portion of this prong of the *Howey* test when it explained that "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Found. Inc. v. Forman*, 421 U.S. 837, 852 (1975). Likewise, the Second Circuit does not interpret the term "solely" in this context literally. *See Aqua-Sonic*, 687 F.2d at 582. Instead, it looks at the parties' positions to evaluate whether the "reasonable expectation was one of significant investor control." *United*

9

*States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008).

Here, GAW Miners emphasized to investors how easy and effortless Hashlets were to use. *See* Complaint, ¶44. GAW Miners and ZenMiner claimed they would do all the work needed for mining to happen. The two companies were entirely responsible for: 1) purchasing the computer equipment used for mining; 2) operating that equipment, which involved providing an appropriate location in which to house the equipment, supplying power and cooling for the equipment, and maintaining the proper functioning of the equipment; 3) connecting that equipment to the Internet and to mining pools and keeping those connections working; 4) engaging in all aspects of mining, including establishing accounts with the various mining pools to enable the payouts of mining proceeds, and properly dividing and allocating GAW Miners' computing power to the various mining pools chosen by Hashlet investors; and 5) calculating the share of payouts for each Hashlet investor and causing such payouts to be deposited into investors' ZenCloud accounts. *See id.*, ¶¶38-40, 43. In addition to funding the initial cost of their Hashlet investment, investors also paid daily "maintenance fees" to subsidize all of these services that they relied upon GAW Miners and ZenMiner to provide. *See id.*, ¶43. GAW's representations that it would expertly and profitably manage all of its responsibilities with regard to its mining operations were marketed as a reason why investors would choose to invest in Hashlets rather than in buying and maintaining mining equipment on their own. *See id.*, ¶¶59, 61, 69-70.

### B. GAW Miners "Made" Misstatements Pursuant to Exchange Act Section 10(b) and Rule 10b-5(b).

Rule 10b-5(b), which implements Section 10(b), prohibits "'mak[ing] any untrue statement of material fact' in connection with the purchase or sale of a security." *Janus Capital*

*Group v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011) (quoting Rule 10b-5(b)).  Under

Rule 10b-5(b), "the maker of a statement is the entity with authority over the content of the

statement and whether and how to communicate it." *Id.* at 2302-03.   GAW Miners "made"

misrepresentations in the information about Hashlets that it posted on its company website, and

in the messages and solicitations its employees, including its CEO, posted on the company-

sponsored and controlled message board.  *See* Complaint, ¶¶57, 59, 69.  These two resources

were significant ways in which GAW Miners communicated with its customers, including actual

and potential Hashlet investors.  Because these were official statements by the company, which

appeared in conjunction with the company's name and logo, GAW Miners is liable as the maker

of the statements contained in those documents.

### C. GAW Miners and ZenMiner Obtained Money and Property Through Means of Direct Misstatements and By Means Of the Misstatements of Others in Violation of Section 17(a)(2).

Like Rule 10b-5(b), Section 17(a)(2) addresses liability for misstatements, but does so

more broadly.  Section 17(a)(2) prohibits any person, in the offer or sale of any security, from

obtaining money or property "by means of any untrue statement of material fact," and can

encompass a defendant's use of a statement that it knows or should have known was materially

false.  *See SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d 786, 796-97 (11th Cir. 2015); *SEC

v. Tambone*, 550 F.3d 106, 127-128 (1st Cir. 2008), *aff'd in rel. part*, 597 F.3d 436 (1st Cir.

2010) (en banc); *SEC v. Stoker*, 865 F. Supp. 2d 457, 465 (S.D.N.Y. 2012).  As discussed above,

GAW Miners made numerous direct misrepresentations through its website and message board,

and obtained about $19 million in revenues from investors who decided to purchase Hashlets.

*See* Complaint, ¶¶51, 58.  In addition, GAW Miners obtained money, in the form of additional

11

Hashlet investments, as a result of public statements made by its CEO that the company knew or should have known were false. *See id.*, ¶¶57-73. GAW Miners is thus liable under 17(a)(2) for those misstatements. ZenMiner, which was always controlled by GAW Miners' CEO, even though it was portrayed as a distinct entity with independent operations until its phony "acquisition" in August 2014, also obtained money, in the form of Hashlet investments, by using and relying on the misrepresentations made by GAW Miners and its CEO. *See id.*, ¶¶27, 32-25, 41, 51; *see also Stoker*, 865 F. Supp. 2d at 463 (17(a)(2) violation established if defendant obtained money indirectly from fraud). ZenMiner purportedly operated the ZenCloud platform through which Hashlets could be purchased and operated and thus obtained money as a result of defendants' joint fraud. *See* Complaint, ¶¶28, 35, 40-43. In addition, both GAW Miners and ZenMiner charged daily maintenance fees to Hashlet owners, purportedly for the upkeep of the (largely) nonexistent equipment in its purported data centers. *See id.*, ¶43. This maintenance fee revenue was directly related to defendants' fraud.

## D. The Statements Made by GAW Miners and Used by GAW Miners and ZenMiner Were Material.

A fact is material if a reasonable investor would view its disclosure as significantly altering the total mix of information in evaluating the merits of the investment. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). A fact is material if it "may affect the desire of investors to buy, sell, or hold the company's securities," or if it "in reasonable and objective contemplation might affect the value of the corporation's stock or securities." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied*, 394 U.S. 976 (1969); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000) (a statement is material if an investor would have considered significant in making investment decisions). GAW Miners' misstatements were

material to Hashlet investors because those lies went to the heart of why investors thought they

were buying Hashlets – to engage in virtual currency mining – and why they would buy more

expensive types of Hashlets – to have access to GAW Miners' and ZenMiners' purportedly

proprietary mining pool named ZenPool. *See* Complaint, ¶¶58, 70-71.  Had investors known,

contrary to GAW's various misrepresentations, that GAW Miners and ZenMiner did not possess

the mining operations they claimed to own, and that their investment money was simply being

recycled to fund purported daily payouts to themselves and other investors, any reasonable

investor would have considered that information in deciding to invest. *See Prater*, 289 F. Supp.

2d at 52-53 (reasonable investor would want accurate information about companies involved in

investment scheme); Complaint, ¶¶61, 66, 67.

### E.  GAW Miners and ZenMiner Employed Schemes and Engaged in Courses of Conduct that Violated Section 17(a)(1) & (3) and Section 10(b) and Rule 10b-5(a) and 5(c) Thereunder.

Both Rule 10b-5(a) and Section 17(a)(1) prohibit "employ[ing] any device, scheme or

artifice to defraud."  17 C.F.R. §240.10b-5(a); 15 U.S.C. §77q(a)(1).  Both Rule 10b-5(c) and

Section 17(a)(3) prohibit "engag[ing] in any" transaction, or act, "practice, or course of business

that operates or would operate as a fraud or deceit upon" any purchaser or person.  17 C.F.R.

§240.10b-5(c); 15 U.S.C. §77q(a)(3).  Collectively, these provisions prohibit schemes and

courses of business that deceive investors and potential investors in connection with, or in the

offer or sale of, securities.  *See, e.g., SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014)

(defendants liable under §17(a)(1) for "their commission of deceptive acts as part of a scheme"

to mislead investors); *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 286-87 (2d Cir. 2013)

(defendants liable as the "architects" of a "scheme" to defraud investors).  In the context of these

rules, the word "deceptive" encompasses "a wide spectrum of conduct involving cheating or trading in falsehoods." *SEC v. Dorozhko*, 574 F.3d 42, 50 (2d Cir. 2009) (concluding that computer hacking could be a deceptive device or contrivance under Rule 10b-5).

GAW Miners' and ZenMiner's scheme to profit from the sale of Hashlets when they knew that they did not have the computer capacity needed to support those Hashlets was a fraudulent scheme and course of conduct that violated both Rules 10b-5(a) and (c) and Section 17(a)(1) and (a)(3). Their conduct was inherently fraudulent because they sold the rights to profit from computing power they did not possess or control. *See* Complaint, ¶¶1, 3, 48-49. Both GAW Miners and ZenMiner facilitated the fraudulent sale of Hashlets through their respective websites. *See id.*, ¶41, 55. Their conduct was also fraudulent in that the payouts that investors actually received from their Hashlets were routinely funded by other investors' new investments, and not by actual mining, as was represented to investors. *See id.*, ¶¶6, 67. Both companies facilitated those Ponzi payments when GAW Miners calculated and funded the purported payouts and ZenMiner made those payouts available to investors through its ZenCloud website interface. *See id.*, ¶¶40, 68, 72. The companies' promotion of Hashlets and their proprietary mining pool ZenPool, also involved numerous misstatements that sought to advance, maintain, and conceal their fraud. *See id.*, ¶58.

### F.  GAW Miners and ZenMiner Acted with Scienter.

Scienter is an element of violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Scienter is a "mental state embracing the intent to deceive, manipulate or defraud," and includes recklessness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976); *SEC v. U.S. Environmental, Inc.* 155 F.3d 107, 111

14

(2d Cir. 1998) (recklessness is sufficient to prove scienter). "'Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Global Telecom,* 325 F. Supp. 2d at 115-16 (*quoting Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). A corporation's officers' states of mind are imputed to the corporation. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

Both GAW Miners and ZenMiner acted with scienter. As alleged in the Complaint, Garza, who controlled both GAW Miners and ZenMiner, and acted on their behalf, knew that the various misstatements issued by GAW Miners were false, or lacked any factual basis when they were issued. *See* Complaint, ¶¶60, 66-68, 71-73. Further, both companies, and Garza, knew that they had promptly oversold the number of Hashlets that could be supported by their limited computing power, yet they continued to sell more. *See id.*, ¶¶52-54. Garza's knowledge and reckless behavior should be imputed to both GAW Miners and ZenMiner for the purpose of scienter. *See SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 390 (S.D.N.Y. 2014).

## II.   THE COMPLAINT ESTABLISHES GAW MINERS' AND ZENMINER'S LIABILITY FOR PARTICIPATING IN AN UNREGISTERED DISTRIBUTION OF SECURITIES.

Section 5(a) of the Securities Act [15 U.S.C. §77e(a)] provides that, unless a registration statement is in effect, it is unlawful for any person, directly or indirectly, to sell a security through the use of any means or instruments of interstate commerce. Section 5(c) of the Securities Act [15 U.S.C. §77e(c)] contains a similar prohibition against offers to sell, or offers

15

to buy, a security unless a registration statement has been filed.  A prima facie case for a violation of Sections 5(a) and 5(c) requires a showing that:  (1) no registration statement was in effect as to the security; (2) the defendant directly or indirectly offered to sell the security; and (3) the offer or sale was made in connection with the use of interstate transportation, communication, or the mails.  *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901-02 (5th Cir. 1980); *Prater*, 289 F. Supp. 2d at 51.  Once the Commission establishes a prima facie violation of Section 5, the defendant has the burden of proving that the securities offered qualified for an exemption from registration.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).  The Commission is not required to show that the defendant acted with intent, let alone scienter, in a Section 5 case.  *SEC v. Softpoint, Inc.*, 958 F .Supp. 846, 859 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).

Here, no registration statement was ever filed for the at least $19 million worth of Hashlets that GAW Miners and ZenMiner sold to more than 10,000 investors.  *See* Complaint, ¶¶51, 92.  Further, Hashlets were both marketed and sold primarily over the Internet, through both a web-based shopping portal, and through ZenMiner's website, ZenCloud.  *See id.*, ¶41.  The offer and sale of securities over the Internet constitutes the use of interstate communication.  *See SEC v. Straub*, 921 F. Supp. 2d 244, 262 (S.D.N.Y. 2013) ("it is undisputed that use of the Internet is an 'instrumentality of interstate commerce'").

## III.    THE COMMISSION IS ENTITLED TO INJUNCTIVE AND MONETARY RELIEF.

### A.    Permanent Injunction

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize the Commission to seek injunctive relief upon a showing that: (1) violations of the securities laws

have occurred, and (2) a reasonable likelihood exists that violations will occur in the future.
*See* 15 U.S.C. §77(t); 15 U.S.C. § 78u(d); *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90,
99-100 (2d Cir. 1978).  Permanent injunctions against future violations of the securities laws
may be issued as part of a judgment by default upon a finding by the Court that a factual basis
for such relief exists.  *See, e.g., SEC v. Management Dyn., Inc.*, 515 F.2d 801, 814 (2d Cir.
1975); *SEC v. Cobalt Multifamily Investors I, LLC*, No. 06-cv-2360, 2011 WL 4899909, *4-5
(S.D.N.Y. June 14, 2011).

      To determine whether there is a reasonable likelihood that a defendant will commit future
violations, courts generally consider: (1) the egregiousness of the conduct; (2) the isolated or
recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the
defendant's assurances against future violations; and (5) the defendant's recognition of the
wrongful nature of his conduct.  *SEC v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998); *SEC
v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976); *Prater*, 289 F. Supp.
2d at 49.  Here, GAW Miners' and ZenMiner's conduct constituted an egregious fraud – they
sold rights to profit from what they knew they did not have.  They kept selling Hashlets for
months despite knowing that they were running a Ponzi scheme.  They earned $19 million in
revenue from their fraud.  There is no logical view of the facts alleged in the Complaint that
suggests their fraud was anything but deliberate and motivated by greed.  Neither company
has made any assurances against future violations, or admitted the wrongful nature of their
conduct.  Although both GAW Miners and ZenMiner currently appear to be dormant, and
their employees seem to have left, both entities still have legal status and have the capacity to
violate the securities laws in the future.  *See SEC v. Amerindo Invest. Advisors, Inc.*, No. 05-

cv-5231, 2014 WL 2112032, * 13 (S.D.N.Y. May 6, 2014) (court entered injunction when entity's inactive status was outweighed by other factors), *see also Management Dyn.*, 515 F.2d at 807 (cessation of illegal conduct does not necessarily justify denial of injunction). Considering the factors set forth in *Cavanaugh*, the Court should enter permanent injunctions prohibiting GAW Miners and ZenMiner from engaging in future violations of Sections 5 and 17(a) of the Securities Act, and Section 10(b) of, and Rule 10b-5 under, the Exchange Act.

### B.      Disgorgement and Prejudgment Interest

The district court has broad equitable powers to order the disgorgement of ill-gotten gains obtained through violation of the securities laws. *See First Jersey,* 101 F.3d at 1474.  As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits.  *See SEC v. Contorinis*, 743 F.3d 296, 306-07 (2d Cir. 2014).  Disgorgement "is not designed to compensate victims or to punish wrongdoers, but is instead meant to deter wrongdoing by forcing a defendant to give up the amount he was unjustly enriched." *Amerindo*, 2014 WL 2112032, * 4 (internal quotations and citations omitted).  "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable." *Manor Nursing*, 458 F.2d at 1103-04.

Disgorgement only needs to be a "reasonable approximation of profits" caused by the violation, and the wrongdoer should bear the risk of any uncertainty in determining the amount of disgorgement. *See First Jersey*, 101 F.3d at 1475; *Cole*, 2014 WL 4723306, *2.  In calculating disgorgement, "the proper focus is revenues, not profits," and defendants "are not entitled to deduct costs associated with committing their illegal acts." *Amerindo*, 2014 WL 2112032, * 15 (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011)).

Amounts that a defendant has returned to its victims should, however, be deducted from the disgorgement amount. *See First Jersey*, 101 F.3d at 1475 (deducting amount paid in class action settlement to victims of defendants' fraud from disgorgement).

In this case, a reasonable estimate of the amount of GAW Miners' and ZenMiner's ill-gotten gains, and thus the appropriate amount of disgorgement, is the amount that Hashlet investors paid to purchase Hashlets, plus the amount that investors were charged in daily "maintenance fees" to maintain the alleged computers supporting their Hashlets, and minus the amount of purported "payouts" they were credited as a result of the Hashlets' claimed mining activity. *See* Complaint, ¶¶43, 51. Because Hashlets were inherently fraudulent, all of defendants' revenue from Hashlet sales should be considered ill-gotten gains. *See SEC v. Razmilovic*, 738 F.3d 14, 31-32 (2d Cir. 2014) (recognizing difficulty in determining with exactitude extent to which defendants' gains resulted from fraud and shifting burden to prove any sums reasonably included were unaffected by fraud). Hashlets were sold between August and at least December of 2014, and so these starting and ending dates provide a reasonable time frame in which to calculate disgorgement. *See id.*, ¶51.

Hashlet investors accessed their Hashlets through the ZenCloud website, which was maintained and controlled by GAW Miners and ZenMiner. *See id.*, ¶¶40-43. The ZenCloud website allowed investors to "activate" their Hashlets, communicate their choice of mining pools, and keep track of their "payouts" from purported mining activity and the daily maintenance fees charged for Hashlets. *See id.* During the course of its investigation leading up to the filing of the Complaint, a copy of the database that GAW Miners and ZenMiner used to operate the ZenCloud website was produced to the Commission. *See* Declaration of Trevor

Donelan ("Donelan Dec."), ¶6.  This database was produced by a former employee of GAW

Miners who used and operated the ZenCloud system.  *See id.*  This database is thus the most

accurate source of information about sales of Hashlets, payouts credited to investors on Hashlets,

and maintenance fees charged for Hashlets, because this database is what the defendants

themselves used to operate Hashlets.  *See id.*, ¶¶6-8.

Based on the Commission's analysis of the data contained in the defendants' own

database, and as detailed in the Donelan Declaration, a reasonable approximation of the

disgorgement that should be awarded is $10,078,331.  *See id.*, ¶¶10-12.  This is a reasonable

approximation of the amount by which GAW Miners and ZenMiner were unjustly enriched as a

result of their fraud.  Because ZenMiner did not appear to have independent finances, or keep

financial records distinct from GAW Miners, and they appeared to function as the same company

during the time period that Hashlets were sold, the two companies should be jointly and severally

liable for the disgorgement amount.  *See id.*, ¶5; Complaint, ¶34; *see also SEC v. Wyly*, 56 F.

Supp. 3d 394, 406 (S.D.N.Y. 2014) (joint and several disgorgement is appropriate when entities

have collaborated or worked closely together).

The Commission also seeks prejudgment interest.  The purpose of ordering payment of

prejudgment interest is to deprive the wrongdoer of the benefit of "what amounts to an interest

free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F. Supp. 286, 295

(S.D.N.Y. 1996); *see also SEC v. Warde,* 151 F.3d 42, 50 (2d Cir. 1998) (prejudgment interest

can be awarded in addition to disgorgement to deprive a defendant of the time value of money).

As with the award of disgorgement, the Court has broad discretion whether to grant prejudgment

interest and what rate to use for calculation.  *See First Jersey,* 101 F.3d at 1476-77 (using IRS

20

underpayment rate); 17 C.F.R. §201.600(b) (Commission Rules of Practice state that prejudgment interest is computed at IRS underpayment rate, compounded quarterly). Prejudgment interest is calculated "for the entire period from the time of the defendants' unlawful gains to the entry of judgment." *First Jersey,* 101 F.3d at 1477.

Given the relative recency of GAW Miners' and ZenMiners' fraud, and the fact that Hashlet investors were credited with daily "payouts" over the course of the Hashlets' very brief lifespan, the Commission has taken a conservative approach favoring the defendants and used the end of December 2014 as the date from which prejudgment interest on the entire disgorgement amount should be calculated, even though defendants made many of their unlawful gains before the end of December 2014. Applying the IRS underpayment rate, compounded quarterly, from December 31, 2014 to the end of the last quarter, yields a prejudgment interest figure of $305,768. *See* Donelan Dec., ¶13. By virtue of the time value of money, GAW Miners and ZenMiner received this additional benefit from the Hashlet investments they obtained through fraud, and should be obligated to repay this amount to the investors who lost the use of their money.

Thus, the appropriate combined amount of disgorgement and prejudgment interest is $10,384,099, and the Commission requests that GAW Miners and ZenMiner be ordered to pay this amount. *See* Donelan Dec., ¶14.

### C.     Civil Money Penalty

As authorized by Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act, the Commission seeks civil penalties against both GAW Miners and ZenMiner. *See* 15 U.S.C. §77t(d); 15 U.S.C. §78u(d). Civil penalties were enacted by Congress "'to achieve the

21

dual goals of punishment of the individual violator and deterrence of future violations.'" *SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1,17 (D.D.C. 1998) (quoting *Moran*, 944 F. Supp. at 296).

Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act establish three tiers of civil penalties. *See* 15 U.S.C. §77t(d)(2); §78u(d)(3).  The most serious level of penalty, referred to as a "third tier" penalty, should be imposed when, as here, "the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and . . . such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §77t(d)(2)(c); 15 U.S.C. §78u(d)(3)(B)(iii).  The amount of a third tier penalty should be set at the *greater* of gross pecuniary gain, or $775,000 per violation for an entity.[1]

"The amount of the penalty shall be determined by the court in light of the facts and circumstances." 15 U.S.C. §77t(d)(2)(A); 15 U.S.C. §78u(d)(3); *see also Razmilovic*, 738 F.3d at 38-39 (penalty of one half of defendant's pecuniary gain, or about $20 million, was appropriate in light of facts).  Courts have looked to the following factors, among others, to determine the reasonableness of a penalty:  (1) the seriousness of the violations; (2) the defendant's scienter; (3) the repeated nature of the violations; (4) whether the defendant has admitted wrongdoing; (5) the losses or risk of losses caused by the conduct; (6) any cooperation provided to enforcement authorities; and (7) ability to pay. *See SEC v. Rosenthal*, 426 Fed. Appx. 1, 4 (2d Cir. 2011); *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), *aff'd sub*

---

[1] Although the statute originally provided for penalties of $100,000 for a natural person and $500,000 for an entity, those amounts have increased respectively to $160,000 and $775,000 for violations after March 5, 2013, the time period for all the conduct charged in the Complaint. *See* 17 C.F.R. §201.1005 and Table V.

*nom SEC v. Kern*, 425 F.3d 143, 153-54 (2d Cir. 2005); *SEC v. DiBella*, No. 3:04-cv-1342, 2008 WL 6965807, *6 (D. Conn. Mar. 13, 2008).

Although the statutes provide maximum penalties "for each such violation," neither the Securities Act nor the Exchange Act prescribe how to calculate the number of violations. For example, the court may count each misrepresentation or deceptive act as a separate violation and impose a penalty for each one. *See, e.g, SEC v. E-Smart Tech., Inc.,* No. 11-895, 2015 WL 5952237, *16 (D.D.C. Oct. 13, 2015) (collecting cases and concluding that multiple misstatements in a single document constituted a single Exchange Act violation for penalty purposes)*; SEC v. Coates*, 137 F. Supp. 2d 413, 428, 430 (S.D.N.Y. 2001) (court calculated penalty by multiplying number of misrepresentations by penalty amount); *SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y 2009) (using eighteen violations of the same regulation to calculate penalty). The court may also consider the number of statutes that were violated, or may consider the number of victims to whom misrepresentations were made or who invested in the fraudulent scheme. *See, e.g. Kenton Cap.*, 69 F. Supp. 2d at 17 n.15 (assessing a $1.2 million penalty calculated by "multiplying the maximum third tier penalty" by the "number of investors who actually sent money" to the defendant).

Here, almost every factor supports a significant third-tier penalty against both GAW Miners and ZenMiner. As described above, there is no question that both GAW Miners and ZenMiner engaged in serious violations of the federal securities laws by virtue of their scheme to oversell Hashlets well beyond their available computing power and to manufacture a customer interface to mislead investors into thinking that they were receiving returns from virtual currency mining. That scheme involved repeated deception and misrepresentation over a period of

23

months. *See Lybrand*, 281 F. Supp. 2d, at 731 (third-tier penalties awarded) ("Far from being an isolated event, the actions of these men involved a multitude of improper securities transactions that occurred over several months – they violated the securities laws repeatedly and with regularity."); *Global Telecom Servs, Inc.*, 325 F. Supp. 2d at 121 (third-tier penalties awarded). The repeated nature of their violations suggests a high degree of scienter.  GAW Miners' and ZenMiner's actions relating to Hashlets were not one-time errors in judgment but rather a regular pattern over months, and the Hashlet scheme was the successor to their earlier, fraudulent business practices.  Further, neither GAW Miners nor ZenMiner has admitted wrongdoing in this matter, or has offered any cooperation to the Commission.  The losses caused by their conduct are staggering both in dollar value and in terms of the number of investors affected by this fraud – over 10,000 people – most of whom lost money on their Hashlet investments.

GAW Miners and ZenMiner should not avoid a civil penalty simply because they presently may not have the funds to pay a judgment.   The "ability to pay" factor, at most, allows the Court discretion to lower the third-tier penalty that would otherwise be appropriate.

> [Defendant's] claims of poverty cannot defeat the imposition of a disgorgement order or civil penalty.  Perhaps, if [defendant] is indeed impecunious, the SEC will eventually prove unable to collect on any judgment.  But to withhold the remedy of disgorgement or penalty simply because a swindler claims that she has already spent all the loot and cannot pay would not serve the purposes of the securities laws. An order of disgorgement and civil penalty are both proper remedies in this case; the future will tell whether the SEC can find assets to levy upon. . . . . As noted above, the Court has already taken defendant's financial situation into account in setting the amount of the civil penalty substantially lower than would otherwise be appropriate.

*SEC v. Inorganic Recycling Corp.,* 2002 WL 1968341, *4 (S.D.N.Y. Aug. 23, 2002); *accord SEC v. Michel*, No. 06-c-3166, 2008 WL 516369, *3 (N.D. Ill. Feb. 22, 2008) ($416,821 civil penalty where defendant had no current income and numerous debts, but had home equity and

retirement accounts); *SEC v. Svoboda*, 409 F. Supp. 2d 331, 348-49 (S.D.N.Y. 2006) ($150,000

civil penalty on defendant whose sole claimed asset was an IRA worth $690,000 and $250,000

civil penalty on defendant whose net worth was claimed to be $45,450); *SEC v. Pardue*, 367 F.

Supp. 2d 773, 777-78 (E.D. Pa. 2005) ($25,000 civil penalty despite defendant's negative net

worth).  The Court should not lower the third-tier penalty based on an inability to pay, because

there has been no such showing here, and the companies' failure to keep accounting records for

their virtual currency transactions means that sources of funds may yet be uncovered to pay any

penalty judgment assessed.

## CONCLUSION

The Commission respectfully requests that this Court enter final judgment against

defendants GAW Miners and ZenMiner and that that judgment permanently enjoin those entities

from future securities law violations and order them to pay disgorgement and prejudgment

interest of $10,384,099, and an appropriate third-tier civil penalty.

Dated: February 12, 2016                                Respectfully submitted,

                                                        SECURITIES AND EXCHANGE COMMISSION
                                                        By its attorneys,

                                                        /s/ Kathleen B. Shields
                                                        Kathleen B. Shields (Mass. Bar No. 637438,
                                                        phv 04710)
                                                        Gretchen Lundgren (Mass. Bar No. 644742)
                                                        Michele Perillo (Mass. Bar No. 629343)
                                                        SECURITIES AND EXCHANGE COMMISSION
                                                        33 Arch Street, 24th Floor
                                                        Boston, MA  02110
                                                        (617) 573-8904 (Shields direct)
                                                        (617) 573-4590 (fax)
                                                        shieldska@sec.gov (Shields email)

Local Counsel:

/s/ John B. Hughes
John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 23rd Floor
New Haven, CT  06510
Phone: (203) 821-3700
Fax: (203) 773-5373

## CERTIFICATE OF SERVICE

I, Kathleen Shields, hereby certify that on February 12, 2016, I caused a true copy of the foregoing document, as well as the supporting declaration of Trevor Donelan and the proposed final judgment, to be filed through the ECF system and, accordingly, the document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").  I also sent copies of those documents by overnight mail to the agent for service of process of defendants GAW Miners, LLC and ZenMiner, LLC.

/s/ Kathleen Shields
Kathleen Shields